1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| 10 ROBERT MICHAEL RUBINO, | CASE NO. 05cv0942-LAB (BLM) |
| 11                     Plaintiff, | **ORDER** |
| 12   vs. | **(1)  GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; and** |
| 13 | |
| 14 | **(2)  DENYING AS MOOT JOINT MOTION TO CONTINUE PRE-TRIAL DATES** |
| 15 COUNTY OF SAN DIEGO, SAN DIEGO COUNTY SHERIFF'S DEPARTMENT and DOES 1 through 30, inclusive, | |
| 16                   Defendants. | [Dkt Nos. 31, 38] |

17    This matter is before the court on the Motion For Summary Judgment ("Motion") brought by

18 defendants the County of San Diego and the San Diego County Sheriff's Department (collectively

19 "County" or "Defendants") in this action for injunctive relief and damages arising out of conditions

20 of confinement prior to plaintiff's conviction. Plaintiff Robert Michael Rubino ("Rubino"), proceeding

21 through counsel, alleges he suffers from several medical conditions which qualify him as a disabled

22 individual within the meaning of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12102. *et*

23 *seq.* ("ADA"), the Rehabilitation Act of 1973 § 504, the California Unruh Civil Rights Act, CAL CIV.

24 CODE §§ 51, 52, 54.1, 54.3, and 55, and other measures enacted to protect the rights of "physically

25 disabled persons." Comp.¶ 9.  He also alleges violations of his civil rights under 42 U.S.C. § 1983 on

26 grounds of deliberate indifference to his medical needs and conditions of confinement.  The County

27 moves for summary judgment on grounds:  Rubino is not disabled under the statutory definitions; he

28 either was not excluded from any benefit or activities at the jails, or any denial of his special requests

was based on legitimate concerns about jail safety and security; and he cannot establish conduct that violated any constitutional right predicated on alleged deliberate indifference to his medical needs. Rubino filed an Opposition, and Defendants filed a Reply. Pursuant to Civil Local Rule 7.1(d)(1), the court finds the issues presented appropriate for decision on the papers and without oral argument. For the reasons discussed below, the Motion is **GRANTED**.

## I.      BACKGROUND

Rubino alleges his constitutional and statutory rights were violated during his three year pre-trial detention following his arrest by the San Diego Sheriff's Department at the age of 62 years in September 2003 on charges of lewd acts on children. He was convicted of those charges in October 2006.[1] He was housed in the Vista Detention Facility ("Vista") from September 2003 through April 2004. At the time of his arrest, he was receiving treatment for heart disease, arthritis, circulatory problems, and diabetes. He alleges he did not receive adequate health care for those problems while in custody. He further alleges after he was moved to the George Bailey Detention Facility ("George Bailey"), special needs items (extra blankets, socks, and mattresses, and chairs or stools) were not provided to him, and his medication regimen was occasionally disrupted. He also alleges he is disabled, and neither the San Diego County jails nor George Bailey are equipped for disabled individuals, in violation of the ADA and the Rehabilitation Act, nor is their transportation equipped to accommodate disabled individuals. He alleges these deficiencies denied him full and equal access to the Defendants' programs, activities, or services and violated his constitutional rights.

By Stipulation and Order entered August 30, 2005, Rubino struck references to 42 U.S.C. § 12181 as a basis for liability in his First claim for relief under the ADA. His First claim survives insofar as it was based on 42 U.S.C. § 12131, *et seq.* Dkt No. 23. The parties further agreed Rubino's Fourth cause of action based on various sections of the California Civil Code should be dismissed, as well as his Fifth cause of action based negligence, and those claims have been dismissed. The remaining causes of action are: First Claim for Violation Of The ADA, 42 U.S.C. § 12131, *et seq;* Second Claim for Violation Of Rehabilitation Act, 29 U.S.C. § 794 (§ 504 of the Act); Third Claim

---

[1]    Rubino filed his Complaint in May 2005, about seventeen months into his three year pre-trial detention. In his Opposition, he contends: "Some of the Conduct continues on today." Opp. 11:1.

1  for cruel and unusual punishment and deliberate indifference to serious medical needs under the Eighth

2  and Fourteenth Amendments (pursuant to 42 U.S.C. § 1983); Sixth Claim for Declaratory Relief to

3  require Defendants to correct the living conditions deficiencies and provide handicap transportation;

4  and Seventh Claim for injunctive relief "to redress his injuries."[2]  (Compl. ¶ 81).

5           The County Sheriff's Department documents Rubino's housing while in detention for the period

6  from his arrest in September 2003 into December 2006, at which time he was awaiting sentencing.

7  Rubino's own testimony tracks the record.

8                    The JIMS database shows that Mr. Rubino was booked into the
                     Vista Detention Facility on September 4, 2003, and placed in
9                    "protective custody" due to the nature of the charges filed against him.
                     Mr. Rubino was housed in protective custody at Vista Detention
10                   Facility until May 12, 2004.

11                   On May 12, 2004, Mr. Rubino was transferred to the San Diego
                     Central Jail in medical housing and remained there for one day.  He was
12                   transferred back to Vista Detention Facility on May 13, 2004 and on
                     May 14, 2004, Mr. Rubino was transferred to the George Bailey
13                   Detention Facility and housed in protective custody.  Mr. Rubino has
                     remained in protective custody in San Diego detention facilities from
14                   that time forward. . . .

15  Chapman Decl. ¶¶ 6, 7 (Def's Lodg. Exh. B).

16           The dispositive issues here are whether Rubino qualifies under the ADA and Rehabilitation

17  Act definitions as a "disabled" person entitling him to pursue his allegations of discrimination based

18  on disability, whether jail personnel were deliberately indifferent to his medical needs and, if so,

19  whether the County can be held liable for alleged deliberate indifference to his health care and living

20  conditions.  The only evidence submitted by the parties related to the substantive merits of Rubino's

21  claims are portions of Rubino's November 15, 2006 deposition at Vista while he awaited sentencing.[3]

22

23      [2]  States are not immune from liability under the Eleventh Amendment for violations of the ADA or
24  Rehabilitation Act.  *See* Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363-64 (2001).  Private
    citizens may seek money damages against public entities that violate Section 12132 of the ADA.  *See* 42 U.S.C.
25  § 12133 (incorporating by reference 29 U.S.C. § 794a);  U.S. v. Georgia, 546 U.S. 151, --, 126 S.Ct. 877, 879
    (2006) (reversing and remanding for further proceedings a case brought by a paraplegic inmate in state prison
26  challenging the conditions of his confinement under 42 U.S.C. § 1983 and Title II of the ADA, naming the
    state, state Department of Corrections, and state prison officials).

27      [3]  Rubino's lodged evidence consists of seven pages from his deposition transcript his counsel states
28  are "additional pages not submitted by Defendants Lodgment."  Dkt No. 34-1.  However, those pages are in
    fact included in the more extensive deposition excerpts Defendants filed as their Lodgment Exhibit A in
    support of the Motion.  Accordingly, the court refers in this Order only to Defendants' Lodgment Exhibit A.

## II.    DISCUSSION

### A.    Summary Judgment Legal Standards

Summary judgment is properly entered if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, demonstrate there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. ("Rule") 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If the moving party shows an absence of evidence to support the non-moving party's claims, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 256(1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1305-1306 (9th Cir. 1982).

To successfully rebut a properly supported summary judgment motion, the nonmoving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inference made in the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]." Reese v. Jefferson School Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000), *citing* Rule 56, Celotex, 477 U.S. at 323, and Anderson, 477 U.S. at 249. The nonmoving party must establish, beyond the pleadings, that there is a genuine issue for trial. Celotex, 477 U.S. at 324; Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). "If reasonable minds could differ," the judgment should not be entered in favor of the moving party. Anderson, 477 U.S. at 250-251. However, summary judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id. In deciding a summary judgment motion, the court does not make credibility determinations or weigh conflicting evidence, as those are determinations for the trier of fact and inappropriate for summary adjudication proceedings. Anderson, 477 U.S. at 249.

### B.    ADA And Rehabilitation Act

#### 1.    Establishing Disability

Title II of the ADA provides that "no **qualified individual with a disability** shall, **by reason of such disability**, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132 (2000 ed.). A " 'qualified individual with a disability' " is **defined as** "an individual with a disability who, with or

- 4 -

without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2).  The Act defines " 'public entity' " to include "any State or local government" and "any department, agency . . . or other instrumentality of a State." § 12131(1).  We have previously held that this term includes state prisons. See *Pennsylvania Dept. of Corrections v. Yesky*, 524 U.S. 206, 210 [] (1998).

U.S. v. Georgia, 546 U.S. 151, --, 126 S.Ct. 877, 878-79 (2006).

Section 504 of the Rehabilitation Act, like Title II of the ADA, provides that no handicapped person shall be denied benefits or be discriminated against "solely by reason of his or her disability . . . under any program or activity receiving Federal financial assistance. . . ."  29 U.S.C. § 794(a).  A plaintiff is a "qualified individual" with standing to sue under those Acts if the plaintiff establishes he or she is "disabled" as the Acts define that term and shows a *prima facie* case of discrimination based on the disability.  *See* Wong v. Regents of University of California, 192 F.3d 807, 816 (9th Cir. 1999).

"The ADA defines an individual with a disability as someone who has 'a **physical or mental impairment that substantially limits one or more of the major life activities of such individual**.' 42 U.S.C. § 12102(2)(A)." Broussard v. University of California, 192 F.3d 1252, 1256 (9th Cir. 1999) (emphasis added).  The complainant must have an actual disability as defined in the statute, that is: "(A) a physical or mental impairment that ***substantially*** limits **one or more of the major life activities of such individual**; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2) (emphasis added); *see* Sutton v. United Air Lines, Inc., 527 U.S. 471, 478-79 (1999) (a disability discrimination case where two sibling applicants were severely myopic and were denied employment on that basis, holding the eyesight was correctable so did not qualify as a "disability" within the ADA definition).[4]  "[T]he ADA's coverage is restricted to

---

[4]  "Because the phrase 'substantially limits' appears in the Act in the present indicative verb form, we think the language is properly read as requiring that a person be presently - not potentially or hypothetically - substantially limited in order to demonstrate a disability.  A 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken.  **A person whose physical or mental impairment is corrected by medication *or other measures* does not have an impairment that presently 'substantially limits' a major life activity**. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not 'substantially limi[t]' a major life activity."

only those whose impairments are not mitigated by corrective measures." <u>Sutton</u>, 527 U.S. at 487. Accordingly, "disability under the Act is to be determined with reference to corrective measures," and petitioners do not state a claim they are substantially limited in any major life activity when corrective measures mitigate the impairment. <u>Id.</u> at 488-89.

> The definition of disability also requires that disabilities be evaluated 'with respect to an individual' and be determined based on whether an impairment substantially limits the 'major life activities of such individual.' § 12102(2). **Thus, whether a person has a disability under the ADA is an individualized inquiry**. See <u>Bragdon v. Abbott</u>, 524 U.S. 624, 641-642 [] (1998) (declining to consider whether HIV infection is a per se disability under the ADA); 29 CFR pt. 1630, App. § 1630.2(j) ('The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual).

<u>Sutton</u>, 527 U.S. at 483 (emphasis added) (emphasis added).

The parties dispute whether Rubino qualifies as "disabled" under the ADA/Rehabilitation Act standards. As discussed below, the only "major life activity" implicated by Rubino's evidence appears to be impairment of his ability to walk long distances, climb, or stand for long periods. He alleges the "denial of access" component of his discrimination claim as: (1) his inability to go out into the outside yard for failure to provide him anywhere to sit other than on the concrete or the ground (Opp. 7:10-12); and (2) failure to transport him "in a vehicle that had handicapped capabilities," so that he was "forced to pull himself up or be yanked up by deputies to get into the bus" (Opp. 7:17-19). He contends those alleged violations of the ADA and the Rehabilitation Act "amounted to punishment." Opp. 8:11-12.

## 2. **Rubino's Disability Evidence**

Defendants contend there are no disputes at this point in the litigation over the facts of Rubino's medical condition, and he is unable to raise a triable issue of fact whether he qualifies as "disabled" under the ADA definition. They emphasize they do not attack his credibility regarding his difficulty in walking and climbing stairs. Rather, "even assuming Plaintiff's condition is exactly how he states (difficulty walking long distances, pain when standing up or lowering down, and great difficulty climbing stairs), he is not 'disabled' under the ADA." Reply 1:24-2:1. They argue Rubino does not qualify as disabled because his mobility, although limited, is not "substantially" limited. Reply 2:1-7.

---

<u>Sutton</u>, 527 U.S. at 482-83 (emphasis added).

1    Rubino states he is certified "disabled" because the DMV issued him a disabled parking placard

2    he used for some time before his arrest.  However, he proffers no authority and no evidence beyond

3    his testimony he received one, no specificity for what condition, and no support for his tacit and

4    dubious inference the DMV's definition of "disabled" and criteria for a finding of parking placard

5    entitlement are necessarily co-extensive with those of the federal statutes.[5]

6    "Even though factual allegations in a motion for summary judgment must be viewed in the

7    light most favorable to the non-moving party, summary judgment is mandated if the non-moving party

8    'fails to make a showing sufficient to establish the existence of an element essential to that party's

9    case.'"[6] Broussard, 192 F.3d at 1258, *quoting* Celotex, 477 U.S. at 322.  The County carried its burden

10   as moving party under summary judgment standards.  Rubino's obligation, to avoid summary

11   judgment, is to cite particular items of evidence he contends create triable issues of fact.  He relies

12   solely on his deposition transcript in support of his Opposition.  His showing is cursory and selective.

13   Although the court is under no obligation to "scour the record in search of a genuine issue of

14   triable fact" (Kennan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996) , nor need it "examine the entire file

15   for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition

16   papers with adequate references so that it could be conveniently found" (Carmen v. San Francisco Sch.

17   Dist., 237 F.3d 1026, 1031 (9th Cir. 2001), the court has extracted from Rubino's deposition transcript

18   excerpts the following physical conditions Rubino identified. and accepts his representations as true,

19   despite the absence of *any* medical record, for purposes of deciding the motion:[7]

20

21

22

---

23   [5]  Rubino offers testimonial evidence only that he "was designated by the State of California as legally handicapped and provided a handicapped placard by the DMV, which he had for a number of years prior to

24   his arrest," and *understood to be* "authorized by a doctor mainly because of his heart condition and arthritis." Opp. 6:l-4, citing Deposition at 39:10-12.

25   [6]  Rubino's bald statements that the County is in violation of the ADA and other such legal conclusions have no evidentiary value for this purpose.  He testified as a hearsay conclusion a Lieutenant Milloy told him:

26   "We're not equipped here in Vista to take care of handicapped inmates."  Depo. 16:11-13.  He also simply opines: "The Vista jail is also in total violation of ADA."  Depo. 16:14-15.

27

28   [7]   The court similarly extracts below those portions of his testimony Rubino could conceivably advance to attempt to create a triable issue of fact on essential elements of his discrimination and deliberate indifference contentions.

1.      His "knees are basically shot from arthritis." [8]  He also states in passing he has arthritis in his hip and shoulder.  After he has been sitting or lying down for a while, **when he first gets up**, his "knees are very stiff, and **the first steps I have are painful and very difficult *until*** I can get, I guess, some circulation."  Depo. 15:25-16:1, 31:7, 36:17-21 (emphasis added).

2.      He is diabetic, first diagnosed about six months to a year before his arrest.  He takes medication to keep it under control, but does not need to take insulin.  He checks his blood sugar twice a day, and had changed his diet.  While in jail, particularly after his hunger strike, "**the diabetes -- some forms of it have dissipated**."  **The doctor told him a few weeks before his deposition** (*i.e.*, while he was incarcerated) that his diabetes was getting worse, **even though the blood sugar has been fairly stable**.  Depo. 20:25, 23:3-24, 24:8-25:6, 25:24-26:8 (emphasis added).

3.      He had begun to develop a new problem "recently," due either to "the cold cell or circulatory," causing him to have very cold feet two or three times a week when he wakes up, with difficulty getting them warm.  **The doctor told him** it is probably related to his diabetes, but could be a combination of causes.  Depo. 25:7-20 (emphasis added).

4.      He had corrective arthroscopic surgeries on both knees in May 2003 (*i.e.*, a few months before his arrest).  The surgeries were for a torn ligament in one, and a torn meniscus in the other, and **they smoothed out the arthritis in both knees**.  He had been **diagnosed with arthritis a year or two before his detention**.  Even so, his 235 pounds dropping from a bunk to the floor "really incapacitated my knees.  Depo. 21:1-2, 26:16-27:18 (emphasis added).

5.      In 1991 or 1992, he had triple bypass surgery and a heart attack, with loss of heart function, although when he took the drug metoprolol prescribed by his cardiologist, his "heart rate was then and for years normal. . . ."  His heart surgery went well, with the only issue thereafter an increased heart rate, **which he stabilized with medication**.  His doctor told him he would not be able to do as many stressful things as before, but his longevity would remain the same.  Depo. 21:3-18, 45:13-46:4 (emphasis added).

6.      Stressful conditions **in prison** caused his heart rate to rise again, **so his level of**

---

[8]   The effects of this condition are described in the Opposition as:  "Plaintiff cannot stand for too long or it aggravates his arthritis."  Opp. 6:21, *citing* Rubino Depo. 43:23-24.

**metoprolol medication was increased**, which brought his heart rate back into **the normal range** along with **another prescribed medication**, but the last two times he was checked, the rate was increasing without further available help because his heart is "weakening." Depo. 21:19-22:7 (emphasis added).

7.      It has "progressively gotten more difficult" for him "to walk **normally**." If he sits for a while, "**my first few steps would be very difficult**," then his knees become less stiff, although **walking distances tires him easily** and "it gets painful." Depo. 47:20-48:4 (emphasis added).

8.      "*Q: But even now in the state that you are in, you are able to walk after you, as you said, kind of get moving, you are able to walk, let's say, down several hallways, things like that? A: Yes, sir.*" Depo 48:5-9 (emphasis added).

9.      Climbing anything is hard for him to do. He used the example of his assigned cell at the time of his deposition, one with two beds. "[M]ost of the guys block the beds off so it's not as cold. And the two vents in my cell are on the ceiling, And **I have a chair**, but can't get on the chair to block them. Even though **the deputies said**, why don't you block the vents, I can't." Depo 48:13-19 (emphasis added).

10.      **He takes 900 prescribed pills a month**, "roughly 400 for pain, 500 for other medical problems," whereas prior to coming to jail, he estimated he took a total of four or five pills a day, and he also now has to **wear a nitroglycerin patch 24 hours a day every day for chest pain**, but continues to have chest pain (with those prescriptions and dosage decisions presumably made and monitored through medical personnel at the detention facilities). Depo. 48:24-49:5 (emphasis added).

11.      *He has never used any aids to help him walk, such as a cane, crutches, or wheelchair,* only a walker for a short time after his knee operations. Depo. 59:21-24. He thinks a walker might help stabilize him when he first gets up, but after he walks awhile, he has to stop anyway because it is "tiring." Depo. 60:1-7 (emphasis added).

12.      He describes his difficulties going to the shower and back due to his arthritis or heart condition as: "the deputies have to walk slowly," and he doesn't get a shower every day, and sometimes its 1:00 in the morning, so his "sleep patterns are all screwed up at the moment, but the thing that is good about it is at least I get warm." Depo. 65:19-66:32.

1    13.    Despite his arthritis and his heart condition -- the only physical impairments he feels

2    he has -- he is able to do things like dress himself and brush his teeth.  Depo. 66:3-10.

3    14.    His deposition is replete with references to seeing doctors and nurses, to medications,

4    to adjustments to medications to accommodate changes in his physical condition, and the like over the

5    course of his detention.

6    ### 3.    Intentional Discrimination Based On Plaintiff's Disability

7    "To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff

8    must prove **intentional discrimination** on the part of the defendant."  Duvall v. County of Kitsap, 260

9    F.3d 1124, 1138 (9th Cir. 2001) (emphasis added).  To establish intentional discrimination under the

10    ADA, the plaintiff must show defendants acted with "**deliberate indifference**."  Id. (emphasis added).

11    "Deliberate indifference requires both **knowledge** that a harm to a federally protected right is

12    substantially likely, and a **failure to act upon that likelihood**."  Id. at 1139 (emphasis added).

13    Rubino's only identified "discrimination" was his self-imposed yard access restriction because

14    he declined to go out unless a chair was brought for him, an accommodation refused on security

15    grounds, and having to board a bus lacking disabled access features which hurt his knees.[9]  Plaintiffs

16    bear the burden of establishing an ADA violation and must identify specific, reasonable, and necessary

17    accommodations that the defendant failed to provide.  Duvall, 260 F.3d at 1139, *citing* Memmer v.

18    Marin County Courts, 169 F.3d 630, 633 (9th Cir. 1999).  "[I]n order to meet the second element of

19    the deliberate indifference test, a failure to act must be a result of conduct that is more than negligent

20    and involves an element of deliberateness."  Duvall, 260 F.3d at 1139.

21    The court extracts the only evidence from Rubino's testimony that could conceivably support

22    the second element of an ADA or Rehabilitation Act claim (*i.e.*, deliberate conduct based on the

23    plaintiff's disability):

24    1.    Some deputies would ridicule him for his difficulty climbing steps.  In particular, he

25    filed a complaint against deputy J. Barrios.  "He said that if you don't like the way we treat you, don't

26    _____

27    [9]   Rubino uses no mobility aid, such as a wheelchair or walker or even cane or crutches.  Depo. 60:1-7.  Rubino does not contend he ever asked for and was denied any assistive device for mobility, so that these public entities cannot be found to have violated any duty to investigate a request for accommodation.  *See*

28    Duvall, 260 F.3d at 1139 (describing a public entity's duty to undertake a fact-specific investigation to determine what constitutes a reasonable accommodation).

1    come to jail.  Stop being a crybaby.  I told him I had a handicap problem.  I can't get up.  So he just

2    yanked me up the stairs" of the bus.  Depo. 40:12-24.

3         2.        His problems at Vista aggravating his arthritis, in addition to the bunk situation, were

4    the cold, the absence of a yard he could use, the absence of handicapped seating there when the ground

5    was too cold to sit on, and the low temperature maintained in the cells.  He also identified the stairs

6    as a big problem at Vista.  He also testified he was not transported to Vista from George Bailey in an

7    ADA compliant bus.  Rather, the vehicle did not have a lift, and he had **to get on in leg irons and**

8    **chains**.  He would be "yanked up the bus steps," causing him to have developed "a chronic permanent

9    back injury."  Depo. 31:8-32:9, 35:12-36:8 (emphasis added).  The court notes his complaint is thus

10   associated with the leg iron and chains impediment, a situation that would be the same for all inmates

11   transported in leg irons and chains, unrelated to any discrimination based on an individual's disability.

12        3.        The exercise yard had no place to sit down, although other inmates would help lower

13   him to the ground to sit, then lift him back up when it was time to leave.  There were no handrails "to

14   speak of" or ramps.  Depo. 15:18-25, 37:19-22. "[T]hey asked me, 'Do you want to go to the yard?'

15   And I told them, 'I can't go to the yard, I can't sit down.'  'Well, the answer is yes or no, Mr. Rubino.'

16   And I say, 'No, I don't want to go to the yard,'" because he can't stand up for an hour, and if he is there

17   by himself, he can't get down on the ground because if he does, his arthritis is aggravated.  They refuse

18   to give him a chair.  Depo. 60:8-25.  He could go to the yard at George Bailey when he was in MOD

19   115, the medical 12-bed facility, because there were benches bolted to the ground there.  The other

20   yard at George Bailey, 3A, had no place to sit.  Depo. 61:1-13.

21        4.        He had to have his lawyer get a court order so he could receive an extra blanket, but

22   he was denied a sweater or extra clothing for warmth, whereas the trustee inmates (he defines as

23   people with short time to do) have privileges to wear sweat shirts and long-sleeved shirts.  Depo.

24   32:22-33:7.  The court notes that complaint again does not involve targeting of disabled detainees for

25   discriminatory treatment due to their disabilities, but rather an institutional distinction between classes

26   of prisoners in the general populations.

27        5.   "According to the ADA, each area of cells was supposed to have 5 percent wheelchair

28   equipped.  In Vista, they weren't there," and at George Bailey, wheelchair accessible cells did not exist,

"which I believe is a violation of ADA,"[10] and "[n]o handrails" either.  At neither Vista nor George Bailey did he see a place with handrails, and "in the dining area [there was not] anyplace where a wheelchair could be brought up to the dining table."  Depo. 37:23-38:12.  The court notes Rubino does not use a wheelchair.

6.      He thinks all the inmates who are "handicapped" have a lot of issues because "these places are not in compliance with" the ADA.  "I'm not the only one that has trouble getting on a bus."  Depo. 63:19-23.

7.      There were places to go for visits with lawyers and others where no stairs were required, but the deputies would have to walk a ways to go there, and they did not want to waste the time to take him **while he was in medical 115.**  Depo. 44:7-12.

### 4.      Analysis

The court finds Rubino fails to raise a triable issue of material fact that his medical conditions "substantially limit" a major life function.  His walking, by his own testimony, is at its worst only for the first few steps he takes after he has been sitting or lying down, then his stiff knees improve as he continues to move.  He testified he is able to walk distances of "several hallways" (Depo. 48:5-9) despite his arthritis and heart condition.  He uses no assistive device yet such as a cane, crutches, walker, or wheelchair, all corrective means by which he could mitigate the physical limitations affecting his ease of mobility.  His degree of mobility creates no triable issue of fact he is "substantially limited" in a  major life activity as would be required for a finding of disability under the ADA or the Rehabilitation Act, defeating those claims as a matter of law.

Even if he had succeeded in establishing a triable issue of fact on the issue of statutory disability, he fails to identify any triable issue of material fact regarding the element of causation, that is, that he was deliberately denied benefits, activities, or programs available to detainees he would otherwise qualify for *because of* his disability.  For example, he produces no evidence or testimony that jail personnel or medical staff have denied any request from him for any devices to help him walk better.  Instead, he alleges the County's purportedly actionable failures to "accommodate" his physical

---

[10]   This sort of generalized allegation unrelated to the physical needs of the plaintiff litigating on the merits of his own situation lacks evidentiary value and foundation.

limitations are denial of a chair in an outside yard, despite being told the institutions' security measures prohibit that accommodation.  As discussed below, Rubino testified officers offered him yard access, but **he refused to go** into the yard without a chair being provided.  He was given various bunk configurations in response to his complaints about difficulty getting in and out of lower, middle, and upper beds.  His allusions to a particular deputy making fun of him is too slim a reed to support County liability for alleged deliberately indifferent discrimination on the basis of disability.

By his own representation, with respect to his difficulty going to the Vista jail for court appearances because of stairs he had to take "to get off the bus, to the holding tank and then return from the holding tank and to get back on the bus," far from displaying "indifference," he acknowledges "Vista recognized Plaintiff had a problem with the steps **and began taking Plaintiff from the holding cell to courtroom in a wheelchair**."  Opp. 76:13-17 (emphasis added), *citing* Rubino Depo. 40:2-5.  Rubino testified: "I had repeatedly requested transportation [from George Bailey to Vista] in an ADA compliant vehicle since I am legally handicapped, certified by the State of California." Depo 35:22-25.  However, his complaint about the bus access related to having to board in leg irons and shackles.  He takes issue with the responses to his numerous complaints that the medical staff deemed him "ambulatory," according to a Captain Ingrassia, "which there is no such classification.  You are either handicapped or you are not handicapped." Depo. 36:1-5.  Rubino's vague generality has no evidentiary value and, as a practical matter, based on his own testimony, he in fact remained "ambulatory" in the medical and common usage sense.[11]

Unsupported allegations and tacit implications are insufficient to show deliberate disability discrimination.  Absent a showing of both the knowledge that a harm to a federally protected right is a substantial likelihood, and a failure to act upon that likelihood, a plaintiff cannot prevail on the "deliberate indifference" element of an ADA or Rehabilitation Act claim.  Duvall, 260 F.3d at 1139, *citing* City of Canton v. Harris, 489 U.S. 378, 389 (1988).  Rubino raises no triable issue of fact adequate to save his statutory claims as a matter of law on either the existence of a disability substantially limiting a major life activity element or on the deliberate discrimination element.

---

[11]   "Ambulatory:  1: of, relating to, or adapted to walking . . . 4a: able to walk about and not bedridden. . . . Merriam-Webster's Collegiate Dictionary, 10th ed. (1998), p. 37.

**C.     Deliberate Indifference To Health Care And Living Conditions**

**1.     42 U.S.C. § 1983 ("Section 1983")**

While not itself a source of substantive rights, Section 1983 is the means by which plaintiffs can seek redress for violations of federal law or constitutional rights.  The parties agree that Rubino was a "pretrial detainee" during the period relevant to this lawsuit.  Accordingly, the applicable constitutional protection at issue is that of the Fourteenth Amendment's Due Process Clause, although the Due Process Clause incorporates the Eighth Amendment's guarantee against cruel and unusual punishment.  Georgia, 126 S.Ct at 881; *see* Bell v. Wolfish, 441 U.S. 520 (1979) (the proper inquiry is whether the complained-of conditions or restrictions amount to punishment of the detainee).  Rubino alleges the County violated his substantive due process rights by their purportedly deliberate indifference to his serious medical needs and intolerable conditions of confinement.  Opp. 8:13-15.

**2.     Rubino's Evidence**

The court extracts from Rubino's deposition transcript the following conduct in support of his claim the County was deliberately indifferent to his serious medical and living condition needs and accepts them as true for purposes of deciding the Motion:

1.     He was in custody in Vista for several months before he was moved to George Bailey.  Depo. 12:5-9.  He was taken once from Vista to the hospital unit in the downtown jail, then back to Vista before his transfer to George Bailey.  Depo. 12:13-22.  He remained at George Bailey, except for trips back to Vista for court appearances, then was transferred back to Vista in August 2006, where he remained to await sentencing.  Depo. 12:23-14:11.  He had to be placed with other inmates  in protective custody at Vista, away from the general population.  Depo. 30:3-6.

2.     George Bailey had better conditions than Vista.  Depo. 14:12-15.  With respect to George Bailey, he complained of the following, while still acknowledging "of all the places, that was probably better" (Depo. 15:21-22):

a.     He filed a whistle-blower complaint in December 2005 because George Bailey was opened in 1993 and he believes it violates the 1990 ADA.  Officials learned about his complaint and moved him out of "3A" **into "a medical 12-bed area**, 115" where conditions were "disgusting" because it was filled with "street drunks with mental problems." Depo.14:19-15:5 (emphasis added).

b.  His 3A area "also did not conform to the ADA" but the cell arrangement permitted him at least to get up and down off the lower bunk, and each two-man cell had its own stool and desk.  Depo. 15:7-11.

c.  While in 3A, he had problems due to his "medical difficulties" when the shower went out on the bottom floor and he had trouble climbing the stairs.  He also had to pull himself up the stairs to receive visitors, a process he said he was told caused "a slight right side hernia."  He also had to take a flight of stairs to go to visits, where he also had to pull himself up.  Depo. 15:12-17; Depo. 37:17-22.

3.  At Vista, "in the MOD here, South 1," he was placed in a middle bunk several times, forcing him to drop 4 to 5 inches to the cement floor, which shocks his arthritic knees, eventually causing him so much pain he "went on a hunger strike and a medical strike," before being **transferred to a medical unit**.  Depo. 16:1-11 (emphasis added).

4.  He was denied several accommodations he asked for at Vista, usually with the reason cited to be security (Depo. 20:4-9:  "That is a pat answer for everything"):

a.  He was **denied a chair to sit on in the MOD 3A** he requested because the day room was closed about 18 hours a day, leaving him no place to sit down.   Depo. 16:21-23.

b.  He was **denied a stool** to get in and out of the middle bunk.  Depo. 16:25-17:1.

c.  He was **denied an extra mat to cushion his drop to the floor from that bunk** so he would not shake up his body and hurt his knees.  Depo. 17:3-5.

d.  He returned to Vista, South 1, in August and had the same problems as before, although **the medical doctor said** he should get a chair for those problems.  Depo. 17:10-14.

e.  **He was moved into the two-man cell *because of* his difficulties in the other area**, which he found easier to live in.  Depo. 17:16-18 ("And that's why they moved me . . . ").

f.  He characterized his residency at Vista since August 2006 as being in virtual "solitary confinement:"  he can't go to the yard because no one is there to lift him or help him down to the ground; some days he only gets out ten minutes a night to take a shower.  Depo. 17:16-23.

g.  His other bed problem at Vista  when he was transferred bach there occurred when he was placed in a bottom bunk. He estimated that bunk is about 3 inches from the floor, and

1  he is unable to get off the ground, so that inmates would have to pull him out of the bunk.  Within a

2  day, his back was sprained.  **He was shipped back to George Bailey then**.  Depo.17:24-18:6.

3       5.    He attributes worsening of his conditions to jail accommodations.  When he first went

4  to Vista, he was placed in a 26-man cell in E1 or E2, with two tiers where he had the lower bunk which

5  was about at chair height, so he had no problem getting in and out.  His problems began when he was

6  moved to South 1 with the different bunk configurations.  South 1 had triple bunks, none of which was

7  good for him -- the bottom was too low for him, the middle one caused him to have to jump down a

8  few inches, and he had no way to get tot he top bunk.  **He stayed there only a month or two before**

9  **the transfer to George Bailey**.  Depo. 29:1-21, 30:12-25.

10       6.    His family brought him special socks without elastic which are better than jail socks

11  cutting off circulation in his legs, but deputies would confiscated them during cell searches.  **"[F]inally**

12  **a sergeant told me to tell them to leave them alone**."  Depo.33:13-34:11 (emphasis added).

13       7.    In Vista, to go to court, he had to navigate "about 40 steps, **even though they**

14  **eventually put me in a wheelchair to bring me back and forth from the holding cell**."  To get to

15  the holding cell, he still had to negotiate about 35 steps, about 18 up and 18 down, and he would have

16  to pull himself up each step which causes his heart to pound.  Depo. 37:4-11.

17       8.    He believes he was legally entitled to "many [unspecified] services" under the Honest

18  Services Act he was criminally denied.  Depo. 38:21-39:2.  The court notes Rubino's Complaint states

19  no such cause of action.

20       9.    The showers lack handrails and can be slippery; at South 1, they were infested with

21  vermin and flies and at George Bailey, with mice.  The inmates had to share toilets in South 1, whereas

22  inmates were not properly screened for health issues and communicable diseases like hepatitis, a

23  condition he testified he knew at least one inmate he identified by name had.  Depo. 41:4-18.

24       10.    He has had a fungus infection, his heart condition has worsened, his arthritis has

25  worsened, he has more circulatory problems, and he got an eye infection.  Depo. 42:8-14.

26       11.    Captain Ingrssia at George Bailey **offered to return him to 3A** from South 1 if he

27  would sign a letter stating he did not mind going up the stairs to visit lawyers and others, **but he**

28  **refused to sign any release,** "[s]o I was stuck with those filthy street people."  Depo. 44:13-17.

12.     "**The nursing staff comes three times a day** to distribute his pills."  Depo. 49:12-13 (emphasis added).

13.     "**The doctors in George Bailey offered to increase the pain medication to a stronger narcotic**, **but I didn't want to** go that route," so stayed with 50 milligrams of Tramadol twice a day, nine Tylenol, and two 600-milligram ibuprofen.  Depo. 49:19-25 (emphasis added).

14.     When he was at George Bailey, **he saw a nurse or doctor "every day."**  At the time of his deposition (when he was back at Vista) he was **seeing a nurse once a week** to check his diabetes, **and they come every day to bring his medications**.  Depo. 50:2-8 (emphasis added).

15.     It took about a month before he got to see a doctor about his cold feet complaints. Depo. 50:11-15. The process at Vista was to request to see a doctor, then a nurse saw the inmate first to decide whether the inmate should see a doctor.  Depo. 50:16-25.  The typical wait would be one or two weeks to see a nurse, then another two or three weeks to see the doctor, although he "assum[es] if you were in crisis with a broken arm you would get quicker treatment."  Depo. 51;13-19.

16.     He testified one of his "biggest complaints" is lack of dental care [although the Complaint contains no allegations related to dental neglect or lack of dental treatment].  They "don't do cavities," so **he had a bad tooth pulled**; his bridge came loose, and **he had to wait "for almost two weeks"** for them to cement it in, which made eating difficult.  Depo. 51:1-9 (emphasis added). The court notes those problems were apparently transitory and were medically addressed.

17.     He experienced problems with administration of his medications.  At Vista, he was occasionally given the wrong medications or the wrong amount of medication, such as once two metorprolol pills stuck together rather than one.  Depo. 52:4-24.  He was unable to estimate how often he had discovered medication problems.  **He believes the errors are due to the breakdown in prison system medical care generally, and the staff dispensing the medications not being an R.N.**  Depo. 53:6-25.  The court notes he testified to no conduct in this regard that could reasonably be construed as  intentional actions to deprive him of medication or otherwise to harm him.

18.     He had more problems with medications at George Bailey than at Vista, but the same type of problem.  **He has no knowledge anyone intentionally gave the wrong medications or the wrong dosage, and "in all fairness, I believe it was more incompetency**."  Depo. 54:16-24

(emphasis added).  Every six weeks "the computer drops you," and the medications *for everyone* needed to be put back in, as well as chronos such as for the extra blanket he was entitled to have.  **His extra blanket chrono is the only one he knows of that has now been made permanent**.  He has had a chronic scalp infection for the last 10 or 12 years for which he daily took a drug called doxycycline, an antibiotic, but that medication dropped off the computer once.  **He eventually got the medication started back up.**  "Evidently the doctor didn't understand" the nature of that dermatology problem.  Depo. 55:5-24, 56:6-10.  That evidence permits no inference of deliberate indifference.

19**.**    **He receives extra underwear and an extra mattress, in addition to his extra blanket**.  However, the medical computer and the deputies' computer don't have the same data, so the deputies have frequently taken his extra items from him **because they do not appear as authorized in the deputies' computer**.  Depo. 56:13-21.  The court notes that evidence permits no inference of deliberate indifference.

20.    **Before he came back to Vista in summer 2006, a "Dr. Adams" "finally said I'm going to make your medications and chronos permanent, so this [*i.e.*,a dropping of some of his prescribed medications and extra items] stops happening to you**."  Rubino thinks that should have happened earlier.  Depo. 57:2-7 (emphasis added).

21.    He went on a hunger strike while in Vista to protest being in the middle bunk because it caused him a lot of pain and he "couldn't get them to do anything to relieve that."  He was **"moved into isolation in medical**," ate nothing but fluids for fourteen days, lost 21 pounds, and at one point was "rushed to UCSD" with extremely low blood pressure, and "[t]hat is what it took **to stop** this horrible treatment."  Depo. 57:15-58:8 (emphasis added).

22.    **When asked whether *he preferred* the medical isolation, they moved him there**.  He complained of solitary confinement there, but he had a bunk he could sit on and a chair he could sit on "so I could read," and he did not have the pain of dropping out of a bunk.  Depo. 58:14-22.

23.    After his 14-day hunger strike, he was moved to central jail **on a hospital floor** for a couple of days.  **They told him he could have his chair "and all that stuff**," but then they moved him back to South .  **He threatened another hunger strike**, **so they moved him** down to George Bailey, all within a matter of a few days.  Depo. 58:23-59:20.

24.     He complained about the food at Vista being too spicy, so he doesn't eat most of the meals provided but rather gets soups from the store "and stuff like that."  The staff **offered to put him "on a soft diet,"** but **he refuses to do that** because it is "mush," essentially "baby food." Depo. 61:17-62:1 (emphasis added).

25.     "Q:  **[H]ave the deputies and staff at Vista . . . done anything to help you with your needs or wants or anything like that?**  A: . . . Overall, they have -- they disclaim and obligation on their part because they are, quote, following orders . . . .  **I guess there is not much else they can do.** If they didn't agree with what is being done here in violation of ADA, I guess their choice would be to quite the job or continue the violations. . . ."  Depo. 62:18-63:8.

26..    He complained about the lack of handrails on inclined ramps in all but one location he remembers.  He complained about a light being kept on 24 hours a day at Vista in E5 and South House the inmates were not allowed to block, **although the cell he had at the time of his deposition had its own light switch and lots of windows**, so "its not oppressive as it was in the other places."  Depo. 64:16-65:15.

### 3.     Municipal Liability

Municipalities can be sued directly for monetary, declaratory, or injunctive relief for deprivation of a constitutional right when a government policy or custom caused that result.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).   "While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights."  Scott v. Henrich, 39 F.3d 912, 916 (9th Cir. 1994).  If a constitutional deprivation is found, the municipality may be held liable even if the individual officers do not appear in the action or are dismissed on grounds such as a statute of limitations bar or the underlying conduct "cannot be ascribed to a single individual officer."  Gibson v. County of Washoe, 290 F.3d 1175, 1186 n.7 (9th Cir. 2002), cert. denied, Washoe County v. Gibson, 537 U.S.1106 (2003). "In considering whether a municipality itself violated a person's rights or directed its employee to do so, the focus is on the municipality's 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'"  Gibson, 290 F.3d at 1187 (citations omitted).

\\

1    There is no vicarious or *respondeat superior* liability under Section 1983, but the predicate for

2  any finding of municipal liability is the underlying constitutional injury at the hands of the individual

3  government actor.  <u>Monell</u>, 436 U.S. at 691.  Municipalities can be sued directly pursuant to Section

4  1983 when the allegedly unconstitutional action implements or executes a policy or an unofficial

5  custom, and the policy or custom "is responsible for a deprivation of rights protected by the

6  Constitution."  <u>Id.</u> at 690.  Similarly, municipal liability can be based on a policy of deliberate

7  indifference.  <u>Henry v. County of Shasta</u>, 132 F.3d 512 (9th Cir. 1997).  Congress intended to impose

8  liability on a municipality only if "*deliberate* action attributable to the municipality itself is the 'moving

9  force' behind the plaintiff's deprivation of federal rights."  <u>Bd. of County Comm'rs v. Brown</u>, 520 U.S.

10  397, 400 (1997), *citing* <u>Monell</u>, 436 U.S. at 694; *see* <u>Mann v. City of Tucson, Dep't of Police</u>, 782 F.2d

11  790, 793 (9th Cir. 1986) (the policy must be the proximate cause of the Section 1983 injury).

12    Thus, there are two routes to Section 1983 municipal liability.  First, a plaintiff can show a

13  municipality itself violated a person's constitutional rights or that it directed its employee to do so, with

14  the state of mind required for liability, if a municipal policy caused the constitutional violation alleged.

15  Second, a plaintiff can allege that through omissions, the municipality is responsible for a

16  constitutional violation committed by an employee, as long as the plaintiff also shows "the

17  municipality's deliberate indifference led to its omission and that the omission caused the employee

18  to commit the constitutional" violation, a requirement mandated by the <u>Monell</u> prohibition against

19  municipal liability under a theory of *respondeat superior.*  <u>Gibson v. County of Washoe</u>, 290 F.3d

20  1175, 1185 (9th Cir. 2002), *cert. denied sub nom* <u>Washoe County v. Gibson</u>, 537 U.S. 1106 (2003).

21  The mere negligence of a state official does not violate the due process clause of the fourteenth

22  amendment.  *See* <u>Daniels v. Williams</u>, 474 U.S. 327, 328 [...] (1986); <u>Davis v. City of Ellensburg</u>, 869

23  F.2d 1230, 1235 (9th Cir. 1989) (emphasis added).

24    Rubino has named no individual defendant and concedes he cannot proceed against the County

25  pursuant to Section 1983 on a *respondeat superior* theory.  Accordingly, the only liability theory

26  available that could support his claim against these defendants alleging unconstitutional  medical care

27  and living conditions is to identify a County policy or custom that caused the injury.  <u>Board of County</u>

28  <u>Comm'rs v. Brown</u>, 520 U.S. 397, 403-04 (1997) ("Requiring a plaintiff to identify a policy ensures

that municipalities are held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality"), *citing* <u>Monell</u>, 436 U.S. at 694.  Isolated instances of wrongdoing by an officer or employee do not establish a "custom or usage" adequate to sustain an actionable claim on that basis. *See* <u>Carter v. District of Columbia</u>, 795 F.2d 116, 124 (D.C.Cir. 1986).  Even if a plaintiff identifies conduct attributable to a municipality, the plaintiff must also demonstrate that through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.  <u>Brown</u>, 520 U.S. at 401 ("That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct link between the municipal action and the deprivation of federal rights").

### 4.    <u>Analysis</u>

"Absent a showing of an expressed intent to punish on the part of detention facility officials," the court determines whether a particular restriction or condition "is imposed for the purpose of punishment or whether [it] is but an incident of some other legitimate purpose. . . . Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate government objective, it does not, without more, amount to 'punishment.' " <u>Bell</u>, 441 U.S. at 538-39.  The court finds as a matter of law Rubino has not established any violation of his constitutional rights.  There is no evidence of any intent to punish him in the restrictions or conditions he identifies.  Absent a constitutional injury that may be pursued under Section 1983, he cannot prevail against any alleged actor on his deliberate indifference to serious medical need or conditions of confinement claims.  The court finds Rubino has failed to raise a triable issue of material fact on the issues of the constitutionality of the treatment he received while a pre-trial detainee.  He also fails to identify any policy, custom, or practice attributable to the named municipal defendants which caused any such deprivation.

From the testimony extracted above, Rubino received:  chronos for the extra blankets, underwear, and mattress he asked for; he was moved around in response to his complaints about his bunkbeds, connoting the opposite of "deliberate indifference" to his needs and preferences, even if his alleged deprivations could remotely be construed as of constitutional magnitude, which the court finds

no reasonable jury could find.  His repeated references to doctors and nurses prevents any reasonable inference his medical needs were ignored, let alone knowingly and with deliberate indifference.  The considerable variety and quantity of medications Rubino received during the relevant time period substantiates the County in no way ignored or interfered with his medication regimen, and  he acknowledged the County responded to his chronic conditions, such as his heart problem, by putting him on "stronger medications to control it" (Opp. 6:22-25, *citing* Rubino Depo. 21:19-25, 22:1-7, 47:6-19) or offering to provide different pain medication (which he refused).  His testimony substantiates even he believes the occasional disruptions in his medications and chrono special items confiscation were the results, at worst, of negligence, computer system incompatibilities, or data base management.

With respect to his conditions of confinement complaints, Rubino describes conduct that illustrates prison officials acknowledged his needs, defeating any inference he was being punished with "deliberate indifference" to his needs.  For example:  he was told he could cover a too-bright light; he was moved to a cell with a switch; and arrangements were made for his prescriptions and chronos to be "permanently" in the computer to avoid dropping off at the six-month general data base update.  He was not denied outdoor yard time.  Rather, he chose not to take any without having a chair officers were not authorized to provide there.  He testified the only seating  he ever saw in any yard were bolted-down benches.  He criticizes the "security reasons" excuse for the denials of his various requests, but he produces no evidence that reason was sham or targeted him due to his disabilities.[12] He admits he was offered **and refused** a "soft diet" in response to his complaints about the spicy meals Vista serves and his complaints about temporary dental problems, which were addressed and resolved.  He admits he was moved to the hospital facility when he embarked on a self-imposed hunger strike.  He recounts he was taken to the hospital after 14 days when the complications from his hunger strike threatened his health, on the apparent initiative of those monitoring him in the jail.  He was provided "900 pills a month," including several prescription drugs to control his various medical conditions.

---

[12]   The constitutionality of any particular jail security policy is raised as a claim in this case, and Rubino has identified none he challenges in this litigation beyond the most conclusory statements:  "Plaintiff is seeking to hold Defendants liable for their [unspecified] specific policies and procedures that have violated the constitutional rights which the government as an entity is responsible under 1983 " (Opp. 8:18-20); "We are dealing with Defendant's [unspecified] specific policies and procedures when it comes to the care and treatment of detainees, with serious medical problems" (Opp. 8:28-9:2).   In general, courts give deference to the security policies and practices in jails. *See* <u>Bell</u>, 441 U.S. 520; <u>Turner v. Safley</u>, 482 U.S. 78 (1987).

In response to his pain complaints, he was offered **and refused** stronger pain medication.  He testified a nurse came daily to deliver his medications and weekly to test his diabetes, and he routinely saw doctors in the normal course of the jail procedures, and assumes had he or any other inmate had a true medical emergency, he believes treatment would have been much faster.  He apparently has never requested or been refused a cane, crutches, wheelchair, or walker to assist in his mobility and, in fact, testifies his walking difficulty due to his arthritis resolves itself sufficiently after a few steps, rendering such aids unnecessary.  He does not dispute he "has been seen by jail nurses and doctors hundreds of time[s] and prescribed dozens of medications," reiterating Defendants' observation.  Opp. 10:20-22.

The court finds Rubino has not carried his burden to identify any triable issue of material fact that the County acted with deliberate indifference to any serious medical or living condition need, or intentionally discriminated against him, particularly as most of the accommodations he testified he asked for he received.  The court is unable to imagine how the level of medical attention Rubino's own testimony substantiates could cause any reasonable trier of fact to conclude those services were constitutionally or statutorily infirm.  Moreover, the only reasonable inference to be drawn from Rubino's testimony about the timing and reasons for the detention facility transfers or movements to different locations within one of the facilities are that they were made to accommodate his complaints and requests or medical needs, all while the facilities operated under the restriction that he be kept from the general prison population and in protective custody due to the nature of the crimes he was accused of committing.  He produced no evidence to create a triable issue of fact the alleged failures to satisfy his demands were attributable to deliberate action or inaction rather than, at worst, to mere negligence or to his requests running afoul of institutional security measures.

Rubino's showing is also inadequate under a <u>Monell</u> theory because he raises no triable issue of fact that any of  the allegedly deliberate indifference to serious medical needs or to substantive due process violated his constitutional rights or were intended as punishment and, even if it did, that it is attributable to any County policy, custom, or practice.  Contrary to Rubino's summary contentions "we clearly have both inadequate medical care and inadequate conditions of confinement" and "a triable issue of fact exists whether the Defendants **behavior** adds up to deliberate indifference" (Opp. 12:1-3 (emphasis added)), no "behavior" can sustain a <u>Monell</u> claim against the County absent a policy,

1  custom, or usage Rubino makes no attempt to identify in the particular as having caused his

2  discomforts or deprivations.

3          **D.    Declaratory And Injunctive Relief**

4          Rubino has not met his burden to avoid summary adjudication of any of his substantive claims.

5  Accordingly, he cannot obtain declaratory relief for "correction of living conditions and handicap

6  transportation"[13] (Comp. 14:14-16) or an injunction in the abstract ordering Defendants to stop violating

7  disabled access laws and to provide "qualified medical care" (Compl. 14:10-13).[14]

8  **III.    CONCLUSION AND ORDER**

9          For all the foregoing reasons, the court finds Rubino has failed to raise a triable issue of material

10  fact to prevent summary adjudication of his remaining claims in Defendants' favor.  Accordingly, **IT**

11  **IS HEREBY ORDERED** Defendants' Motion For Summary Judgment is **GRANTED**, and the Clerk

12  shall terminate this case as to all claims and all parties.  All pre-trial dates in this matter on the calendar

13  of the undersigned District Judge are hereby vacated, and the parties' Joint Motion To Continue Pre-

14  Trial Dates is **DENIED AS MOOT**.

15          **IT IS SO ORDERED**.

16  DATED:  March 12, 2007

17

18                                      **HONORABLE LARRY ALAN BURNS**
                                        United States District Judge

19

20

21

22

23

24

25

26      [13]   The court notes Rubino's transportation issue was associated with his trips for court appearances,
27  a situation presumptively mooted by his conviction and anticipated December 2006 sentencing.

28      [14]   "In the context of injunctive relief, [the plaintiff] must additionally demonstrate a sufficient
likelihood that he will again be wronged in a similar way." Fortyune v. American Multi-Cinema, Inc., 364 F.3d
1075, 1081 (9th Cir. 2004).  Rubino has failed to demonstrate he was "wronged" in the first instance.